UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,

                           Case No.  20-cr-20430

vs.

                           HON. GERSHWIN A. DRAIN

D-1 RAAD KOUZA,
D-2 RAMIS KOUZA,

        Defendant(s).

**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT RAAD KOUZA'S MOTION FOR JUDGMENT OF ACQUITTAL [#128], VACATING DEFENDANT RAAD KOUZA'S CONVICTION ON COUNT IV, DENYING DEFENDANTS' JOINT MOTION FOR AN EVIDENTIARY HEARING AND A NEW TRIAL [#129], DENYING DEFENDANT RAMIS KOUZA'S MOTION FOR JUDGMENT OF ACQUITTAL [#130], SETTING BRIEFING SCHEDULE AND HEARING DATE**

## I.  INTRODUCTION

On November 8, 2024, the jury returned a guilty verdict against Defendants Raad Kouza and Ramis Kouza on Count I of the Indictment for conspiracy to commit health care fraud, and a guilty verdict on Count IV as to Defendant Raad Kouza for an individual act of health care fraud.  Now before the Court are the following motions:  (1)  Defendant Raad Kouza's Motion for Judgment of Acquittal under Rule 29 of the Federal Rules of Criminal Procedure, (2) Defendant Ramis Kouza's Motion for Judgment of Acquittal Pursuant to Fed. R. Crim. P.

29(c), and (3)  Defendants Raad Kouza's and Ramis Kouza's Joint Motion for an Evidentiary Hearing and a New Trial under Rule 33 of the Federal Rules of Criminal Procedure.

These matters are fully briefed; and upon review of the parties' submissions, the Court concludes that oral argument will not aid in the disposition of these matters.  Accordingly, the Court will determine the present motions on the briefs. *See* E.D. Mich. L. Cr. R. 12.1; E.D. Mich. L.R. 7.1(f)(2).  For the reasons that follow, the Court grants in part and denies in part Defendant Raad Kouza's Motion for Judgment of Acquittal, denies Defendants' Joint Motion for an Evidentiary Hearing and a New Trial, and denies Defendant Ramis Kouza's Motion for Judgment of Acquittal.

## II.    FACTUAL BACKGROUND

The Indictment in this matter alleged that Defendants conspired to bill Medicare, Medicaid, and Blue Cross Blue Shield of Michigan ("BCBS") for medications that were not dispensed to patients.  During the trial, the jury heard from cooperating witness Hani Zaher, who testified that he began working as a floater pharmacist at ER Drugs at the end of 2009, where Raad Kouza was the owner and Ramis Kouza was the manager.  ECF No. 104, PageID.1230-1232. Later, Mr. Zaher became a co-owner of Seaway Pharmacy with Raad Kouza around 2010.  *Id*., PageID.1235.

2

Mr. Zaher testified that he adopted the practice of not reversing bills for prescriptions that were never picked up by patients at Seaway.  Mr. Zaher explained that he learned to do this from Raad Kouza and Ramis Kouza when he worked at ER Drugs.  *Id.*, PageID.1249.  Mr. Zaher further testified that when he was at ER Drugs, he observed prescription labels "sitting on the counters . . . that are beyond 14 days," which indicated to him that fraud was occurring at ER Drugs. *Id.*, PageID.1243.  Mr. Zaher also testified that he talked with Raad Kouza and Ramis Kouza about the old prescription labels at ER Drugs, and both Raad and Ramis Kouza told him to dispense the medication if the patients came to the pharmacy.  *Id.*, PageID. 1247. Mr. Zaher further explained that he and Raad Kouza would target expensive antipsychotic medications, such as Abilify and Seroquel, as well as expensive inhalers, for their billing but not reversing scheme.  *Id.*, PageID.1250.   Mr. Zaher also claimed to have discussed not reversing medications at Seaway with Raad Kouza.  *Id.*, PageID.1226-1227.

Mr. Zaher also testified that he replicated the "IOU" system at Seaway, a scheme he also learned from Raad Kouza and Ramis Kouza while working at ER Drugs. *Id.*, PageID.1252-1254.  The "IOU" scheme involved billing for the full volume of medications prescribed but only dispensing a portion of those medications to the patient.  *Id.*

Finally, Mr. Zaher admitted that he was charged and pled guilty to conspiracy to commit health care fraud related to his conduct while co-owner of Seaway Pharmacy. *Id.*, PageID.1226. Mr. Zaher testified that he committed health care fraud by billing for medication that was never provided to the patient. *Id.*, PageID.1226-1227. He further asserted that he committed these fraudulent acts along with Raad Kouza and Ramis Kouza. *Id.*, PageID.1227.

During cross examination, the jury heard that Mr. Zaher had previously been charged with embezzlement arising from his employment at a different pharmacy in 2001. ECF No. 105, PageID.1303-1304. While Mr. Zaher successfully completed a diversion program and the criminal case was dismissed, the Michigan Department of Licensing and Regulatory Affairs found Mr. Zaher responsible for the embezzlement and sanctioned him by taking away his license for six months and one day. *Id.*, PageID.1305. The jury also heard that in 2020 when Mr. Zaher entered his guilty plea for health care fraud stemming from his conduct at Seaway Pharmacy, he failed to identify Ramis Kouza as one of his co-conspirators. *Id.*, PageID.1311. Rather, at the time he entered a plea of guilty, Mr. Zaher only identified Raad Kouza as a co-conspirator. *Id.*

Justin Jarbo was a pharmacy technician at ER Drugs and testified that he received direction from both Raad Kouza and Ramis Kouza on pharmacy operations. ECF No. 110, PageID.1862. He explained that both Raad Kouza and

Ramis Kouza were his friends and that he trusted the directions they gave him.  *Id.*, PageID.1930.  Mr. Jarbo explained that, if a patient did not pick up a prescription at ER Drugs, "I didn't do anything," and "there was really no practice" of reversals at ER Drugs.  ECF No. 109, PageID.1817.  Mr. Jarbo testified that he would scratch out the name on the prescription bottle and return it to the shelf, but he would not reverse the billing for that medication in SRS, the computer program used at the pharmacy to bill Medicare, Medicaid, and BCBS.  *Id.*, PageID.1821-1822.  Mr. Jarbo also corroborated Zaher's testimony concerning the "IOU" scheme used by Raad Kouza and Ramis Kouza at ER Drugs.  *Id.*, PageID.1814-1816.

Pharmacist Tammy Berry testified that she worked at all of the pharmacies that Raad Kouza owned, including Food Town, ER Drugs, Seaway, St. Paul and Rockwood. ECF No. 102, PageID.1064-1065, 1073.  Ms. Berry was the pharmacist-in-charge at Food Town.  *Id.*  She also testified that Raad Kouza wanted a certain number of prescriptions billed each day.  *Id.*, PageID.1080.  She explained that Raad Kouza told her to put medication back on the shelf and not to reverse the bill if a patient failed to pick up his or her medication.  *Id.*, PageID.1080-1081. She maintains that Raad Kouza would destroy the labels that had been printed but the medication was never picked up by the patient.  *Id.*, PageID.1081.  Raad Kouza also informed Ms. Berry that "independent pharmacies

have a hard time making money and we had to do whatever we could to make money." *Id.*, PageID.1084.  During cross examination, counsel for Defendant Raad Kouza inquired whether Ms. Berry had been fired from Food Town, and she denied that she had been fired.  *Id.*, PageID.1183.

Ms. Berry also corroborated Mr. Zaher's testimony that the billing, but not reversing scheme involved targeting expensive drugs.  *Id.*, PageID.1080.  As to Food Town's psychiatric patients, Raad Kouza told Berry "to bill them as soon as possible because they had the expensive psych medications."  *Id.*, PageID.1084.  She explained that inhalers such as Atrovent, Advair, Spiriva and Symbicort, were very expensive medications.  *Id.*, PageID.1088-1089.  She further testified that Raad Kouza instructed her that when patients failed to pick up their inhalers that she should put the inhaler back on the shelf and not reverse the bill.  *Id.*, PageID.1088.  He explained that if the patient eventually came in to pick up the inhaler, she should just give the inhaler to the patient.  *Id.*

Ms. Berry further testified that she believed Ramis Kouza was licensed as a pharmacist because she witnessed him "doing things in the pharmacy that appeared to be pharmacist jobs," such as "bagging medication."  *Id.*, PageID.1069.  She also explained that she understood Ramis Kouza had authority over her at Food Town.  *Id.*, PageID.1073-1074.  Similarly, ER Drugs Property Manager Christina Kempf

described Ramis Kouza as her boss at ER Drugs, and he did "a lot of paperwork." ECF No. 114, PageID.2291.

Evidence obtained from search warrants executed at the pharmacies in January of 2020, included pill bottles obtained from ER Drugs, St. Paul, and Rockwood with prescription labels affixed to the bottles, some of which were blacked out, consistent with Mr. Jarbo's testimony. ECF No. 116, PageID.2566. Special Agent Pemberton reviewed the claims data for a selection of the seized pill bottles and found that they corresponded to final, paid claims to Medicare and Medicaid. *Id.*, PageID.2577-2583.

The Government's financial witness, Richard Ruffing, testified about the flow of funds from the insurance programs and pharmacy benefit managers to the pharmacies and then to the Defendants. ECF No. 115, PageID.2409. The evidence revealed that Raad Kouza, Ramis Kouza, or an entity controlled by the Defendants received profits from each of the five pharmacies. *See* Gov. Ex. GX1103.

Medicare contractor Qlarant conducted invoice reviews, also called invoice reconciliations, shortage analyses, or "IRs" of the pharmacies. John Bullinger, lead pharmacist at Qlarant, testified that of the top ten shortage drugs across all pharmacies, the antipsychotic medication Seroquel 300 mg was the top shorted drug. ECF No. 107, PageID.1594; *see also* Gov. Ex. 1101.0011. Four additional

medications, all either antipsychotic or inhalers, were short across four of the five pharmacies.  *Id*., PageID.1594, GX 1101.0011.  Bullinger testified that Qlarant's IRs found "significant shortages" across the five pharmacies, resulting in a loss of approximately $14.5 million and indicated that could be a sign that potential fraud has occurred.  *Id*., PageID.1595.

Corroborating Mr. Bullinger's testimony concerning the shortages, employees of pharmacy benefit managers CVS/Caremark and Optum, as well as employees from the State of Michigan Office of Inspector General ("State OIG") testified about the shortages their entities identified during audits of the pharmacies, which also found shortages of the same expensive drugs identified by Qlarant.  ECF No. 106, PageID.1424-1485, GX 207, 313, 319, 324, 327, 332 and 333; ECF No. 101, PageID.952-993, GX 222-224, 226-228, 232A-C, GX 233A-B, ECF No. 110, PageID.1937-1979.

Additionally, there was evidence introduced showing Ramis Kouza's involvement in the submission of fabricated records to Optum Rx in response to its audit of the subject pharmacies.  ECF No. 114, PageID.2296; GX 223.0065. Specifically, Christina Kempf testified that her name appeared on an affidavit that ER Drugs submitted to Optum Rx during the audit, wherein Kempf is listed as the "Controller" of ER Drugs.  *Id*., PageID.2296.  However, Ms. Kempf testified that she was never the controller of ER Drugs, and did not know what a controller was.

*Id*.  Despite the substance of the affidavit, Ms. Kempf testified that she never managed the inter-pharmacy transfers or ordered medications at ER Drugs.  *Id*., PageID.2297-2300.  Evidence later introduced established metadata that connected Ramis Kouza's email address to the draft version of the Kempf affidavit.  And other records admitted at trial showed Ramis Kouza listed as the "Controller" on pharmacy benefit manager paperwork for ER Drugs.  ECF No. 116, PageID.2524, GX 255; ECF No. 113, PageID.2235-2237.

Romany Abdelmalak, the pharmacist-in-charge at St. Paul, testified about the Optum Rx audit and that he became worried when he could not locate enough invoices to cover the audit.  ECF No. 112, PageID.2069.  Abdelmalak raised these concerns with Raad Kouza, who responded that Abdelmalak should contact the wholesalers to obtain the missing invoices.  *Id*., PageID.2071.  Abdelmalak also informed Ramis Kouza that he needed invoices for the medications transferred to other pharmacies, and Ramis responded that he would take care of it.  *Id*., PageID.2077-2078.

Mr. Abdelmalak further testified that he conducted his own audit at St. Paul, and an invoice from wholesaler Intermed caught his attention because it suggested "a couple of high quantities on items that I don't recall receiving before."  *Id*., PageID.2078-2079.  He identified a number of drug purchases that appeared

unusually high for Advair and Spiriva, insulins like Lantus, Symbicort and Abilify. *Id*., PageID.2080-2092.

## III.   LAW & ANALYSIS

### A.  Defendants' Motions for Acquittal

Defendant Raad Kouza argues that he should be acquitted on Count I because the Government's evidence did not show, beyond a reasonable doubt, that Mr. Kouza orchestrated a fraudulent scheme.  Defendant Raad Kouza asserts that the Government's experts cherry-picked the data in order to arrive at the large amount of inventory shortages claimed, the Government's witnesses were biased or compromised—or testified about events beyond the scope of the indicted conspiracy.  The unbiased witnesses testified that they did not witness any fraudulent activity at Raad Kouza's pharmacies.  Nor did any credible witness testify that they failed to receive prescriptions that were billed to their insurance. Raad Kouza further argues that he should be acquitted on Count IV because the only evidence supporting this offense is the testimony of a witness who cannot recall whether she received the medication at issue.

Defendant Ramis Kouza argues he is entitled to a judgment of acquittal because there was a paucity of evidence connecting Ramis Kouza to the health care fraud conspiracy.  The only witness who identified Ramis Kouza as being involved in the fraudulent scheme was Hani Zaher, a cooperating witness.  Ramis Kouza

argues that Mr. Zaher was the Government's most compromised witness, whose testimony was contradicted by every other witness.  Ramis Kouza further asserts that the audits undertaken by the pharmacy benefit managers and the State's OIG's were incomplete and did not include all of the invoices from all of the wholesalers used by the subject pharmacies.

Finally, Ramis Kouza attacks the Government's evidence that Ramis Kouza tried to conceal the inventory shortages during the audits by submitting an affidavit purportedly drafted and signed by the Controller of ER Drugs, Christina Kempf. Ms. Kempf testified that she was never the Controller of ER Drugs, and did not draft nor sign the affidavit submitted in response to the audit.  However, Ramis Kouza maintains that the Government never established the substance of the affidavit was untrue.  Thus, based on the dearth of evidence connecting Ramis Kouza to the fraudulent scheme, he maintains the Court should grant him a judgment of acquittal on Count I.

When a district court reviews a conviction for sufficiency of evidence, district courts must ask "whether, after viewing the evidence in the light most favorable to the prosecution, and after giving the government the benefit of all inferences that could reasonably be drawn from the testimony, any rational trier of fact could find the elements of the crime beyond a reasonable doubt." *States v. Jones*, 641 F.3d 706, 7010 (6th Cir. 2011).  This imposes a "heavy

burden" on defendants. *Id.* "A review for sufficiency of the evidence requires [the court] to draw all available inferences and resolve all issues of credibility in favor of the jury's verdict." *United States v. Wheaton*, 517 F.3d 350, 365 (6th Cir. 2008) (internal quotation marks and citation omitted). "Circumstantial evidence alone is sufficient to sustain a conviction and such evidence need not remove every reasonable hypothesis except that of guilt. *Id.* (citing *United States v. Spearman*, 186 F.3d 743, 746 (6th Cir. 1999)).

### 1. Count I

In order to prove that Defendants engaged in a health care fraud conspiracy under 18 U.S.C. § 1349, the Government had to establish beyond a reasonable doubt the existence of "(1) an agreement between two or more persons to (2) knowingly and willfully execute[], or attempt[] to execute, a scheme or artifice . . . to defraud any health care benefit program; or . . . to obtain, by means of false or fraudulent pretenses, representations, or promises, any of the money or property owned by, or under the custody or control, of any health care benefit program, in connection with the delivery of or payment for health care benefits, items or services." *United States v. Chaney*, 921 F.3d 572, 593 (6th Cir. 2019) (internal quotation marks and citation omitted).

Here, viewing the evidence in the light most favorable to the prosecution, the Court concludes that a rational trier of fact could conclude that Defendants

Raad and Ramis Kouza conspired to commit health care fraud and wire fraud. Numerous witnesses testified about Defendants' ownership, control and decision-making authority at the pharmacies and involvement in the conspiracy to bill medications that were not dispensed.  Zaher testified that he adopted the practice of Seaway not reversing prescriptions that he learned from both Raad and Ramis Kouza while working with them at ER Drugs. Zaher further testified that he talked with both Raad and Ramis Kouza about the old prescription labels, and both told him to dispense the medications when the patients came to the pharmacy, even though the prescriptions were already at a point at which they should have been reversed. Zaher also testified about the scheme to target expensive medications for the "IOU" scheme and the "bill without reversing" scheme, including for anti-psychotic medications.

Jarbo corroborated that ER Drugs had no practice of reversing medications that had not been picked up by patients.  Jarbo confirmed that all directives he received regarding pharmacy operations came from either Raad Kouza or Ramis Kouza.  Despite Ramis Kouza asserting he was not a pharmacist, and had no authority over decisions made by pharmacists, Berry testified that she believed he was her supervisor at Food Town and witnessed him always performing pharmacist type jobs in the pharmacy, including bagging medication.  Berry further testified that Raad Kouza directed her to put medications back on the shelf if they

had not been picked up and told her "not to reverse" the unclaimed medications. Berry testified that Raad Kouza directed her to bill the psychiatric patients as soon as possible because they had the expensive anti-psychotic medications. Additionally, Agent Pemberton testified that pill bottles obtained during a search at ER Drugs, St. Paul, and Rockwood with prescription labels affixed to the bottles corresponded to final, paid claims by Medicare and Medicaid.

John Bullinger, lead pharmacist at Qlarant, testified that of the top ten shortage drugs across all pharmacies, the antipsychotic medication Seroquel 300 mg was the top shorted drug.   Four additional medications, all either antipsychotic or inhalers, were short across four of the five pharmacies.  Bullinger testified that Qlarant's IRs found "significant shortages" across the five pharmacies, resulting in a loss of approximately $14.5 million and indicated that could be a sign that potential fraud has occurred.  Corroborating Mr. Bullinger's testimony concerning the shortages, employees of pharmacy benefit managers CVS/Caremark and Optum, as well as employees from the State OIG testified about the shortages their entities identified during audits of the pharmacies, which also found shortages of the same expensive drugs identified by Qlarant.

Additionally, evidence showed Ramis Kouza's involvement with submitting an affidavit erroneously claiming that Christina Kempf was the Controller of ER Drugs, even though she was never the Controller at ER Drugs, and had not drafted

nor signed the affidavit submitted in response to the Optum Rx audit.   Finally, evidence was introduced showing that the Defendants profited from each of the pharmacies.

While both Defendants take issue with the testimony of cooperating witness Hani Zaher and assert that Mr. Zaher was biased and compromised; however, "[e]ven the uncorroborated testimony of an accomplice can support a conviction." *United States v. Stewart*, 628 F.3d 246, 255 (6th Cir. 2010)(citation omitted).   "The fact that coconspirators were cooperating with the government as a result of a plea bargain does not change the result."   *Id.* (citation omitted).   Moreover, when reviewing sufficiency of the evidence claims, district courts "do not weigh the evidence, consider the credibility of witnesses or substitute [its] judgment for that of the jury." *United States v. Hilliard*, 11 F.3d 618, 620 (6th Cir. 1993)(citation omitted).

Here, Raad Kouza's and Ramis Kouza's challenge to their convictions on Count I must fail.  Testimony and exhibits introduced during the trial showed the Defendants conspired to commit health care fraud by billing for medications that were not dispensed to patients.  As such, after reviewing the evidence in the light most favorable to the prosecution, the Court concludes that any rational trier of fact could find the prosecution proved the elements of health care fraud beyond a reasonable doubt as to both Raad Kouza and Ramis Kouza.

## 2.  Count IV

To prove a violation of § 1347, the government had to prove beyond a reasonable doubt that Defendant Raad Kouza "(1) knowingly devised a scheme or artifice to defraud a health care benefit program in connection with the delivery of or payment for health care benefits, items or services; (2)  executed or attempted to execute this scheme or artifice to defraud; and (3) acted with intent to defraud." *United States v. Anderson*, 67 F.4th 755, 770 (6th Cir. 2023) (quoting *United States v. Semrau,* 693 F.3d 510, 524 (6th Cir. 2012)), cert. denied, 144 S. Ct. 552 (2024).  Fraudulent intent may be proved by circumstantial evidence, and a jury may "infer intent from evidence of efforts to conceal the unlawful activity, from misrepresentations, from proof of knowledge, and from profits." *Id*. (quoting *United States v. Persaud*, 866 F.3d 371, 380 (6th Cir. 2017)).

Defendant Raad Kouza argues that the Government failed to present sufficient evidence to sustain his conviction on Count IV.  The Government introduced the testimony of Melissa Wilson related to the alleged dispensation of Atrovent to Wilson on or about May 16, 2016, through Food Town.  At trial, Ms. Wilson testified that she suffered from asthma since she was a child.  ECF No. 112, PageID.2164.  She further testified during her direct examination that:

> Q.     Back in 2015, '16 were you using Symbicort and Spriva?
>
> A.     I know at one time I was on that Advair Disk.

Q.      Advair?

A.      Yeah.  The purple one.  It was before they changed to Spiriva.

Q.      So you've used Symbicort and Spiriva but then also Advair for a little while, is that fair?

A.      Yes.  And regular inhalers.

Q.      Okay.  And are those like the monthly maintenance meds, those inhalers?

*                              *                              *

Q.      Okay.  For a little bit of time were you using an inhaler called Atrovent?

A.      It sounds familiar, but I'm not sure.

Q.      Have you used Atrovent recently?

A.      Uh-uh.

Q.      Is that a no, ma'am?  We just have to get it for the court reporter.

A.      Sorry. No.

Q.      Um, do you recall, I mean, how many Atrovent inhalers do you think you ever got?

MR. HAISHA:  Judge, I object.  She hasn't even established that she ever used them or really knew what they were.  She's only indicated that she may or may not have used them recently.

THE COURT:      Let's get a time frame.

Q.      (By Mr. Crapko, continuing) In 2014 or – excuse me.  I misspoke.

In 2016, let's go to that, do you recall ever receiving Atrovent inhalers?

A.      That name I don't.  I know it, but I don't know if I ever did.

Q.      Yeah.  You don't recall ever receiving Atrovent inhalers?

A.      Yeah.

Q.      Because your main inhalers are Spiriva and Symbicort?

A.      Yes.

Q.      Do you have any memory at all of receiving Atrovent from Food Town in 2016?

A.      I know a couple of times when I was sick I got a different inhaler, but I'm not sure what the name of it was.

Q.      You don't know if it was Atrovent or if it was –

A.      No.  I don't know.

Q.      Okay.  And you mentioned Advair, too?

A.      Yeah.  The Advair Disk.

Q.      Okay.  Was that what you used when you got sick?

A.      The Advair Disk –

Q.      Yeah.

A.       -- went along with Symbicort at the time –

Q.      Okay.

A.      -- before the Spiriva came in.

Q.      I see. Okay.

*Id.*, PageID.2164-2169.

When Ms. Wilson was cross-examined, she admitted that she was taking about 17 different medications during the 2015 and 2016 timeframe and could not recall the names of all of the medications. *Id.*, PageID. 2170-2171. She also testified that she did not know who Raad Kouza was and had not seen him at Food Town. *Id.*, PageID.2171. On redirect examination, Ms. Wilson testified that she did not review her Explanation of Benefits forms sent by her insurance carrier. *Id.*, PageID.2173.

Defendant Ramis Kouza argues that Ms. Wilson's testimony confirms that she simply did not remember what inhalers she received nearly a decade ago— much less whether she failed to receive the Atrovent inhaler referenced in the Indictment. Defendant further points to the fact that Ms. Wilson had no idea who Raad Kouza was or how he was involved in Food Town—much less whether he was personally involved in billing for her May 26, 2016 Atrovent prescription. Defendant argues the Government presented no evidence that Mr. Kouza submitted a billing request for the Atrovent, instructed another person to do so, or was in any way personally involved in filling the prescription. Given the dearth of evidence, Defendant argues the Government failed to show that (1) Raad Kouza billed or directed another person to bill this prescription for Ms. Wilson, or (2) that Ms. Wilson failed to receive the Atrovent.

The Government counters that the evidence introduced during trial was sufficient to support Raad Kouza's conviction on Count IV.  The Government argues that Wilson testified that her main inhalers were Spiriva and Symbicort, and that she did not recall receiving Atrovent inhalers.  Additionally, Special Agent Pemberton testified that the claims data yielded a final paid claim for Wilson on May 16, 2016, with a paid amount of $285.68.  The Government asserts given Wilson's clear recollection of all inhalers except Atrovent, which was purportedly dispensed on May 16, 2016, the evidence was sufficient to uphold Raad Kouza's conviction on Count 4.

Here, the Court finds the Government failed to establish Raad Kouza committed health care fraud with respect to the dispensation of Atrovent to beneficiary Melissa Wilson on or about May 16, 2016.  Ms. Wilson did not testify that she never received Atrovent in May of 2016.  Rather, she could not recall whether she had received it or whether she had not received it.  She testified that she did not know if she ever received Atrovent, and further indicated that when she was sick, she got a different inhaler but did not recall the name of it.  This testimony is inadequate to establish that she did not receive the Atrovent medication in 2016.  Thus, no rational trier of fact should have found Raad Kouza guilty with respect to Count IV because the beneficiary failed to definitively state that she had not received the medication at issue in May of 2016.  As such, there

was insufficient evidence for the jury to conclude Raad Kouza was guilty of the

crime charged in Count IV.

Based on the foregoing considerations, Defendant Raad Kouza's Motion for

Judgment of Acquittal is granted in part and denied in part.  His motion is granted

with respect to Count IV and denied as to Count I.  Defendant Ramis Kouza's

Motion for Judgment of Acquittal is denied.

### B. Defendants' Joint Motion for a New Trial and an Evidentiary Hearing

Defendants assert a new trial is warranted because (1) Defendants' due

process rights were violated when the government threatened a defense witness'

potential exposure for perjury; (2)  the evidence at trial created a variance from the

conduct charged in the indictment, (3)  the Court impermissibly admitted Rule

404(b) evidence that unduly prejudiced the Defendants, (4) the cumulative effect

of these errors denied Defendants' the right to a fair trial, and (5) the verdict is

against the manifest weight of the evidence.

Rule 33 of the Federal Rules of Criminal Procedure provides that "a court

may vacate a judgment and grant a new trial if the interest of justice so requires."

Fed. R. Crim. P. 33(a).  "This standard is a great obstacle to overcome . . . and

presents . . . a very heavy burden." *United States v. Hughes*, 505 F.3d 578, 592

(6th Cir. 2007).  It is the Defendants' burden to prove the need for a new trial and

the Sixth Circuit Court of Appeals has indicated that such motions "should be

granted sparingly and with caution." *United States v. Turner*, 995 F.2d 1357, 1364

(6th Cir. 1993).

### 1. Due Process

Defendants first argue that their due process rights were violated when the

Government impermissibly interfered with their right to present a defense by

claiming that Defendants' proposed witness, Wayne Siler, had self-incrimination

exposure if he were to testify.  Defendants argue that the Government knew of

Defendants' plan to call Mr. Siler to testify in their case-in-chief on October 8,

2024, but it was not until November 3, 2024, the day before Mr. Siler was

scheduled to testify, that the Government advised he had potential criminal

exposure related to his alleged efforts to conceal the shortages at Seaway

Pharmacy.  Specifically, the Government wrote:

> In light of Hani Zaher's testimony involving GX 437, we believe that
> Mr. Seiler may have Fifth Amendment exposure involving efforts to
> conceal the shortage at Seaway during the State OIG audit.  We intend
> to flag these Fifth Amendment issues with the Court.

ECF No. 129, PageID.3072.

Defense counsel promptly contacted Mr. Seiler and informed him of the

Government's November 3, 2024 email.  Mr. Seiler spoke with his personal

attorney that evening.  His counsel, Jamele Hage, advised Mr. Seiler to refrain

from testifying.  Defendants argue that had the Government given Mr. Seiler

reasonable notice of its position on his criminal exposure, he would have been able to properly discuss this matter with his attorney and would have elected to testify. Defendants maintain that the Government's threat of prosecution substantially interfered with Mr. Seiler's free and unhampered decision to testify.

Without Mr. Seiler's testimony, the Defendants argue they lost their only available witness to rebut the Government's SRS expert's testimony. In particular, Defendants argue Mr. Siler would have provided testimony concerning:

> OIG Audit issues: Mr. Seiler would have testified that the OIG audit misused an SRS reporting tool (a "Drug Utilization Report" or "DUR") affecting the audit's ultimate conclusion on specific inventory shortages.

> Misuse of SRS Data: Mr. Seiler would have testified that the Government misused SRS data against Defendants at trial.

> Inventory Shortage Calculations: Mr. Seiler's testimony would have raised serious questions about the Government's inventory-shortage calculations.

> SRS Will-Call Function: Mr. Seiler would have explained why prescriptions left in the "will-call" accounting took of the Kouza pharmacies did not suggest fraud. Mr. Seiler would have clarified that the "will-call" accounting tool was an optional accounting function that supported pick-up and delivery, rather than one flagging prescriptions that needed to be reversed. Mr. Seiler would have also explained that the Kouza pharmacies did not use a signature log device until late 2016—a critical reason why some prescriptions were left in "will-call."

> Reversal rates: Mr. Seiler would have explained that the Kouza pharmacies' low reversal rates were common for independent

pharmacies, which seldom use auto-refill systems and instead actively coordinate prescription pickup or delivery with patients.

The Government counters that Defendants' due process rights were not violated. The Government maintains that despite numerous requests for reciprocal discovery, Defendants' counsel never provided any disclosures with respect to the scope of Mr. Seiler's testimony. As such, it was not until the testimony of Hani Zaher on October 28, 2024 concerning an email from Wayne Siler to Raad Kouza and Ramis Kouza about the OIG state audit that the Government realized there may be potential Fifth Amendment concerns with Mr. Seiler's testimony. According to the Government, this email and testimony suggested that Mr. Seiler may have been involved with the Defendants' efforts to conceal the fraud at Seaway Pharmacy from the OIG state auditors. Therefore, it was not until November 3, 2024, when defense counsel confirmed their intent to call Mr. Seiler that the Government raised the issue of potential Fifth Amendment issues with respect to Mr. Siler's testimony.

"The Supreme Court has expressly recognized that a party's right to present his own witnesses in order to establish a defense is a fundamental element of due process." *United States v. Foster*, 128 F.3d 949, 953 (6th Cir. 1997)(citing *Washington v. Texas*, 388 U.S. 14, 19 (1967)). The Sixth Circuit Court of Appeals "has found that government conduct which amounts to substantial interference with a witness' free and unhampered determination to testify will violate due

process." *Id.* (citing *United States v. Pierce*, 62 F.3d 818, 883 (6th Cir. 1995), *cert. denied*, 516 U.S. 1136 (1996) and *United States v. Saunders*, 943 F.2d 388, 392 (4th Cir. 1991), *cert. denied*, 502 U.S. 1105 (1992)).  However, "even if a defendant is able to prove prosecutorial misconduct amounting to substantial interference with a witness, that misconduct will not result in a new trial if it can be said to be harmless." *Id.* (citing *Bank of Nova Scotia v. United States*, 487 U.S. 250, 255-56 (1988)).

Moreover, "merely warning a witness of the consequences of perjury" does not require reversal.  *Pierce*, 62 F.3d at 832 (citation omitted) ("Judges and prosecutors do not necessarily commit a [due process] violation merely by advising a witness of the possibility that he or she could face prosecution for perjury if his or her testimony differs from that he or she has given previously.").  "Where, however, the substance of what the prosecutor communicates to the witness is a threat over and above what the record indicates is necessary, and appropriate, the inference that the prosecutor sought to coerce a witness into silence is strong." *Id.* (citation omitted).

In this case, the Government never spoke with or attempted to contact Mr. Seiler.  The email to defense counsel was the sole communication from the Government concerning potential Fifth Amendment implications with respect to Mr. Seiler's testimony.  The Government sought to raise the issue with the Court

the following day, and did not directly threaten Mr. Seiler with criminal prosecution.

In any event, even if the Government's conduct substantially interfered with Mr. Seiler's free and unhampered determination to testify, any error was harmless because Mr. Seiler's proffered testimony critiquing the State's OIG audit, the meaning of reversal rates in the SRS system, and how certain tools worked within the SRS system would have constituted expert testimony that was untimely pursuant to Federal Rule of Criminal Procedure 16(b), and his testimony would have been excluded on that basis.

"Lay testimony derives from personal knowledge of the relevant facts." *See United States v. Whaley*, 860 F. Supp. 2d 584, 595 (E.D. Tenn. 2012). Lay testimony can be transformed into expert testimony if the witness is relying "to a significant degree on specialized knowledge acquired over years of experience." *United States v. White*, 492 F.3d 380, 403 (6th Cir. 2007). As noted by the Advisory Committee Notes to the 2000 Amendment to Rule 701, "the distinction between lay and expert witness testimony is that lay testimony results from a process of reasoning familiar in everyday life, while expert testimony results from a process of reasoning that can be mastered only by a specialist in the field." "The fact that an employee is speaking from his or her experience within a business does not immunize his or her testimony when it reaches beyond the witnesses' personal

perceptions." *Whaley*, 860 F. Supp. 2d at 596.  As such, testimony may be expert

testimony "even though that scientific, technical or other specialized knowledge [a

witness] relie[s] upon was developed in his career[.]" *Frausto v. Cooper Tire &*

*Rubber Co.*, No. 3:12-0761, 2014 U.S. Dist. LEXIS 95973 (M.D. Tenn. July 10,

2014).

Here, on the one hand, Mr. Seiler's testimony was based on his personal

experience using the SRS software.  He does not claim to have specialized training

in computer software programming or analysis.  However, his testimony concerns

a specific software program developed for pharmacies to manage their business.

The general public could not be expected to have experience with, or even access

to, this software.  A review of the content of Mr. Seiler's proposed testimony

reveals that his testimony went beyond explaining his involvement with the subject

pharmacies and the Defendants.  He claims to have knowledge concerning how the

SRS system's tools work, the meaning of certain terms within SRS and that he can

critique the OIG's audit of the subject pharmacies.  In the Court's view, this

anticipated testimony requires specialized knowledge beyond the average

layperson, including technical knowledge of how the software operates.

As such, this testimony would have been excluded under Rule 16(b)(1)(C)

of the Federal Rules of Criminal Procedure, which requires the defendant to "give

to the government a written summary of any testimony that the defendant intends

to use" as expert testimony under Rule 702.  Rule 16(d)(2) gives the court four options for dealing with violations of the rule, one of which is to "prohibit th[e] [offending] party from introducing the undisclosed evidence."

Finally, the Court notes that even if Defendants had provided proper notice and Mr. Seiler's testimony was deemed admissible, it would not have impacted the verdict, but rather the conclusions reached by the OIG Audit, thus the testimony would relate to the accuracy of loss calculations, rather than the issue of guilt.

Based on the foregoing considerations, the Court concludes Defendants' Due Process rights were not violated.

### 2.  The Uncharged Conduct and Rules 403 and 404(b)

Prior to the start of the trial, Defendants' counsel objected to the Government's plan to present evidence relating to two pharmacies not charged in the Indictment–Rockwood and St. Paul.  Specifically, the Government sought to introduce:  (1)  pharmacy-benefit manager records showing Defendants' ownership and control over the uncharged pharmacies, (2) testimony of a Michigan state auditor who initiated an investigation into the Kouza pharmacies at St. Paul, (3) evidence of the invoice reconciliations that Medicare contractor Qlarant conducted for the uncharged pharmacies, which showed significant drug shortages during the same timeframe of 2010 to 2019 charged in the Indictment, and (4)  the testimony of pharmacists Abdelmalak and Runnan Shen, who were expected to testify about

drug shortages at St. Paul and Rockwood, and the Defendants' attempts to use those pharmacies' inventory to conceal the shortage at the charged pharmacies during the PBM and state audits.

The Defendants objected arguing evidence about the two uncharged pharmacies was neither background evidence nor admissible under Rule 404(b). In a February 2024 Order, this Court overruled the Defendants' objections without prejudice. The Court's Order determined that the evidence set forth in the Government's Notice constituted intrinsic evidence. ECF No. 44, PageID.221. Specifically, the Court found that evidence regarding Defendants' activities at St. Paul and Rockwood–the ownership documents, Qlarant's invoice reviews, and the testimony of Abdelmalak, Shen, and the state of Michigan investigator–was "intrinsic evidence of the crimes charged, and thus is not governed by Rule 404(b)." *Id*. The Court further found that the "[e][vidence from the uncharged pharmacies is intrinsic evidence because it has a temporal connection to the charged offenses, arises from the same events as the charged offense, and forms an integral part of Abdelmalak's, Shen's and the State of Michigan investigator's testimony and will complete[ ] the story of the charged offense." *Id*., PageID.223 (internal quotation marks omitted). The Court's February 24, 2024 Order permitted Defendants to file supplemental briefing in support of their objections

pending the results of their expert's findings. *Id.* However, Defendants never filed any supplemental briefing concerning this evidence.

As an initial matter, the Court's ruling on the Government's Notice hinged on its finding that the evidence related to the uncharged pharmacies was intrinsic to the charged conduct. *Id.* As such, evidence related to Defendants' conduct at the uncharged pharmacies was admitted as intrinsic evidence, thus Defendants' objection was not governed by Rule 404(b). *Id.,* PageID.223-224. The Court held, in the alternative, "evidence from the uncharged pharmacies is admissible under Rule 404(b) on the issues of knowledge, intent and absence of mistake." *Id.,* PageID.224.

Here, the Court's decision to admit intrinsic evidence was not erroneous. During the trial, the Government noted the distinction between the charged and uncharged pharmacies and the common thread of health care fraud committed by the Defendants. In its opening statement, the Government argued that Defendants "orchestrated this fraud through the three pharmacies listed in the indictment. They are ER Drugs, Seaway, and Food Town." ECF No. 101, PageID.920. The Government further stated:

> Now, I've mentioned so far three pharmacies, but you're going to hear about two more. You're going to hear about Rockwood and St. Paul. The defendants aren't charge[d] with anything regarding these two pharmacies, but they are important. Because it may be suggested to you that these other two pharmacies can account for the inventory shortages or what they did at the other three was just a

mistake or unintended.  Well, you're going to see the exact opposite.
The evidence is going to show you those shortages at these two
pharmacies, too.  Corroborating the evidence showing you their intent
to commit fraud through this scheme.

*Id*., PageID.923-924.  Other witnesses also testified that ER Drugs, Seaway and

Food Town were the charged pharmacies in the Indictment.  ECF No. 107,

PageID.1591, ECF No. 115, PageID.2420.

The jury was thus apprised on multiple occasions that ER Drugs, Seaway,

and Food Town were the focal point of the case.  Additionally, Defendants never

objected to the jury instructions, nor did they request that the Court modify the

instructions to include a limiting instruction despite the Court's invitation for the

parties to do so.  ECF No. 119, PageID.2814. The Court's instruction on other acts

evidence, stating, "[r]emember that the defendants are on trial here only for the

offenses charged in the Indictment, not for the other acts" was not confusing or

misleading.  ECF No. 121, PageID.2973.  In any event, the Court concludes

evidence at trial established one conspiracy and that the conduct at the uncharged

pharmacies was intrinsic to that conspiracy, therefore a limited instruction was not

warranted.  Because the uncharged conduct was intrinsic to the conspiracy and the

lack of a limiting instruction did not seriously affect the fairness of the proceedings

in this case, Defendants are not entitled to a new trial.

### 3.  The Uncharged Conduct and Material Variance

Defendants argue that the admission of evidence related to the uncharged pharmacies created a material variance.  The Fifth Amendment provides that an accused be tried only on those offenses presented in an indictment and returned by a grand jury. *United States v. Manning*, 142 F.3d 336, 339 (6th Cir. 1998). A variance occurs when "the charging terms are unchanged, but the evidence presented at trial proves facts materially different from those alleged in the indictment." *United States v. Beals*, 698 F.3d 248, 258 (6th Cir. 2012). Variances are not "per se prejudicial." *United States v. Budd*, 496 F.3d 517, 521 (6th Cir. 2007). To reverse a conspiracy conviction because of a variance, the court must find "(1) the indictment alleged one conspiracy, but the evidence can reasonably be construed only as supporting a finding of multiple conspiracies, and (2) the variance prejudiced the defendant." *Id*.; *see also United States v. Blackwell*, 459 F.3d 739, 762 (6th Cir. 2006).

The inquiry into whether the variance constitutes reversible error focuses on whether there is a danger that a defendant was convicted based upon evidence of a conspiracy in which the defendant did not participate. *Id*. In making this determination, the evidence must be viewed in the light most favorable to the government. *United States v. Peatross*, 377 Fed. App'x 477, 485 (6th Cir. 2010). A variance is not reversible error unless it affected a defendant's substantial rights.

*United States v. Robinson*, 547 F.3d 632, 642 (6th Cir.2008). "Finding a variance does not mandate a reversal; in order for the variance to constitute reversible error, a defendant must at the very least show that this variance prejudiced him." *United States v. Bakri*, 505 F. App'x 462, 468 (6th Cir. 2012) (citing *United States v. Caver*, 470 F.3d 220, 237 (6th Cir. 2006)). Prejudice exists "where the defendant is unable to present his case and is taken by surprise by the evidence offered at trial;" "where the defendant is convicted for substantive offenses committed by another;" or "where spillover [occurs] because of a large number of improperly joined defendants." *Id*. (citing *United States v. Swafford*, 512 F.3d 833, 842-43 (6th Cir.2008) (internal quotation marks omitted; alteration in original).

At trial, the government presented evidence showing the Defendants engaged in one conspiracy to commit health care fraud and wire fraud that occurred at both the charged and uncharged pharmacies. The principal considerations in determining the number of conspiracies are: (i) the existence of a common goal; (ii) the nature of the scheme; and (iii) the overlapping participants in various dealings. *United States v. Schultz*, 855 F.2d 1217, 1222 (6th Cir. 1988); *United States v. Smith*, 320 F.3d 647, 652 (6th Cir. 2003). The evidence, which has been discussed at length *supra*, showed that Raad Kouza and Ramis Kouza were united in their common goal of causing the submission of false claims to insurance for expensive medications that were never dispensed, and that they executed this

33

plan at both the charged and uncharged pharmacies. Defendants have identified no distinction between the conduct at the charged and uncharged pharmacies that would amount to separate conspiracies.  Indeed, this is because the Defendants utilized the same tactics – targeting expensive drugs, failing to reverse claims, concealing the fraud from auditors, profiting from the scheme – at all five pharmacies. The commonality of these techniques across all five pharmacies confirms that the government presented evidence of only one conspiracy to the jury. As there was no evidence of multiple conspiracies, no material variance occurred.

**4.  Cumulative Error**

Although the Sixth Circuit has held that "the cumulative effect of errors that are harmless by themselves can be so prejudicial as to warrant a new trial," "[w]here, as here, no individual ruling has been shown to be erroneous, there is no 'error' to consider, and the cumulative error doctrine does not warrant reversal." *United States v. Sypher*, 684 F.3d 622, 628 (6th Cir. 2012); *see also United States v. Deitz*, 577 F.3d 672, 697 (6th Cir. 2009) ("[C]umulative-error analysis is not relevant where no individual ruling was erroneous."); *Getsy v. Mitchell*, 495 F.3d 295, 317 (6th Cir. 2007) ("[A defendant's] cumulative-error claim therefore fails because there are simply no errors to cumulate.").

Even if Defendants succeed in persuading this Court that their claims had arguable merit, given the overwhelming evidence presented at trial, any such errors would be harmless. And though even harmless errors when considered cumulatively may warrant relief, the Defendants cannot show that any such errors "cumulatively produce[d] a trial setting that [was] fundamentally unfair" sufficient to warrant a new trial. *See Walker v. Engle*, 703 F.2d 959, 963 (6th Cir. 1983) ("Errors that might not be so prejudicial as to amount to a deprivation of due process when considered alone, may cumulatively produce a trial setting that is fundamentally unfair.").

### 5.  Manifest Weight of the Evidence

Defendants provide no support for their claim that the verdict is against the manifest weight of the evidence. The Sixth Circuit held in *Burks* that "it's only when 'exceptional circumstances' arise that a trial judge 'may intrude upon the jury function of credibility assessment.'" *United States v. Burks*, 974 F.3d 622, 627-28 (6th Cir. 2020)(citing *United States v. Cote*, 544 F.3d 88, 101 (2d Cir. 2008)). No such exceptional circumstances exist here, as the weight of the evidence – including witness testimony, data analysis, audit records, financial records, search warrant evidence, email evidence – all supported the jury's decision to convict.

## IV.   CONCLUSION

Accordingly, for the reasons articulated above, Defendant Raad Kouza's Motion for Judgment of Acquittal [#128] is GRANTED IN PART and DENIED IN PART. Defendant Raad Kouza's conviction on Count IV is VACATED.

Defendants' Joint Motion for an Evidentiary Hearing and a New Trial [#129] is DENIED.

Defendant Ramis Kouza's Motion for Judgment of Acquittal [#130] is DENIED.

Defendants shall file Responses to the Government's Motion for Imposition of Forfeiture Money Judgments no later than May 30, 2025.

The Government may file a Reply no later than June 6, 2025.

A hearing shall be held on the Government's Motion for Imposition of Forfeiture Money Judgment on June 18, 2025 at 10:00 a.m.

SO ORDERED.

Dated:  May 16, 2025                              /s/Gershwin A. Drain
                                                 GERSHWIN A. DRAIN


### CERTIFICATE OF SERVICE

Copies of this Order were served upon attorneys of record on
May 16, 2025, by electronic and/or ordinary mail.
/s/ Marlena Williams
Case Manager